BARTON et al. v. BAILEY et al.

No. 2575.

Court of Civil Appeals of Texas. Eastland.

March 28, 1947.

Rehearing Denied May 23, 1947.

278

Brooks, Duke & Templeton, of Abilene, and Clay Coggins, of Roby, for appellants.

W. Marcus Weatherred, of Coleman, for appellee.

GRAY, Justice.

B. A. (Bailey) Barton, a bachelor about 85 years of age, died in Coleman County, Texas, on November 12, 1945, leaving an estate consisting of 1882½ acres of land, 63 head of cattle, cash, bonds and other personal property, all of a total value of $60,000 or more. He had previously, on April 4, 1944, executed a will, which was admitted to probate by the County Court of Coleman County on November 26, 1945. The deceased left no surviving parents, brothers or sisters, and in said will he devised and bequeathed to his nephew, A. F.

(Frank) Bailey, a life estate in said entire estate, save and except as to some minor bequests, with remainder in fee simple to Harbert Anderson Bailey and Annie Therisa Dimbleby, son and daughter of said A. F. Bailey. The special bequests were to his nephew, Jim Madison Barton, and niece, known as Willie Barton, children of his deceased brother, William P. Barton, and to Lillie Jackson and Mary Alice Jackson, nieces of his deceased sister, Mary Elizabeth Barton, to each of whom he gave $100 in cash. The will was admitted to probate without contest. An inventory, appraisement and list of claims was filed and approved, and said A. F. Bailey duly qualified as independent executor without bond as provided for in the will.

However, on February 12, 1946, said Jim Madison Barton, Willie Barton Graham Hardy and husband, C. D. Hardy, Mary Alice Jones and husband, J. W. Jones, and Christene Ranft, filed in said County Court their petition to set aside the probate of said will. Said contest was heard and on April 6, 1946, denied, from which order, contestants gave notice of appeal to the District Court. Trial was had before a jury in the District Court, the court submitting the only two issues raised by the pleadings, to wit: (a) as to whether the deceased, B. A. Barton at the time of making said will had testamentary capacity, which issue was answered in the affirmative; and (b) whether said deceased at said time was acting under the undue influence of A. F. Bailey, Mrs. A. F. Bailey, Harbert Anderson Bailey and Annie Therisa Dimbleby, or either or all of them, which second issue the jury answered in the negative. In response to the jury verdict, on May 27, 1946, the court rendered judgment against contestants, from which judgment they have appealed to this court.

On the issue of the alleged incapacity of B. A. Barton to execute said will, contestants pleaded in substance: (a) that said purported will was not signed, declared and published by said deceased in the presence of attesting witnesses, or any two of them, nor did said witnesses subscribe their names thereto in the presence of B. A. Barton, nor in the presence of each other, nor at the special instance and request of B. A. Barton; (b) but if it be found as against said first allegation, then it was alleged that when he signed said will, said B. A. Barton was very seriously ill and suffering from intense mental and physical pain, as he had suffered long prior thereto and from which he afterward died; (c) that at said time, B. A. Barton's mind was so impaired that he did not know what he was doing; did not know the conditions of said will; did not know the nature and amount of his property or the objects of his bounty, their true names and relationship to him; and (d) at said time, B. A. Barton was not of sound mind or memory and not capable of making a will.

On the issue of undue influence, contestants pleaded that the execution of said will was wholly brought about through the undue influence of A. F. Bailey, Mrs. A. F. Bailey, Harbert Anderson Bailey and Therisa Dimbleby, and through the compulsion, duress, threats, persuasion and argument of said named parties, the free will and volition of B. A. Barton was destroyed and said B. A. Barton yielded on account of his desire for peace and quiet.

The said will having been previously admitted to probate, the burden was on contestants to establish their case by a preponderance of the evidence, and as illustrative of what our courts have held in such cases, and of the general rules of law applied, we quote a few expressions from recognized authorities. One of the most cogent statements we have found is by the distinguished Chief Justice Fly in the case of Cook et al v. Denike et al., Tex.Civ. App., 216 S.W. 437, 439: "This is an attack upon a will already probated, to set it aside and annul it. It was an attack upon the judgment of a court which had heard the testimony and probated the will. When the will was probated the presumption arose of the validity of the instrument; due compliance with all legal formalities being shown. The rule always obtains that testamentary incapacity will never be presumed as to a will duly probated, and the burden, rests on him who seeks to set aside a will, duly probated, to show such incapacity. Alexander, Wills, § 396, p. 535. By the judgment of the county court everything necessary to the probate of the will

was determined, and in an original suit to set it aside on account of insanity or want of testamentary capacity, or undue influence, or fraud, the burden rests upon the plaintiffs to establish such matters, and every presumption will be indulged in favor of the probate of the will. Fowler v. Stagner, 55 Tex. 393."

■ As bearing upon the testator's capacity to make a will, the real test is whether at the time, he knew what he was about, whether he knew what property he owned, the objects of his bounty and understood the general effect of his will. 44 Tex.Jur. 558, 559, Sec. 17; Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292 (error dismissed).

"The propounded instrument is sustained as a general rule where the evidence shows that the decedent personally instructed the draftsman as to its preparation;" 44 Tex. Jur. 601, Sec. 59; Vaughan v. Malone, Tex.Civ.App., 211 S.W. 292, "and the case of the proponent is strengthened by the circumstance that the decedent was alone with the draftsman, the proponent or beneficiary not being present." McKenzie v. Grant, Tex.Civ.App., 93 S.W.2d 1160; Taylor v. Small, Tex.Civ.App., 71 S.W.2d 895. "In favor of the proponent's case, it is to be considered that the draftsman was the decedent's attorney, and that the witnesses were honorable and competent persons." McKenzie v. Grant, and Taylor v. Small, supra.

"Where it is shown that the execution of the writing was supervised by a lawyer, much probative force attaches to his opinion that the instrument expressed the wishes of the decedent." 44 Tex.Jur. 601, 602, Sec. 59; In re Bartels' Estate, Tex. Civ.App., 164 S.W. 859 (Writ Ref.).

■■ Pertinent to the issue as to undue influence, we quote from 44 Tex.Jur. 566, Sec. 25, as follows:

"Probate is not to be denied merely on proof that the provisions of the propounded instrument were influenced by statements addressed to the judgment or intelligence of the decedent, suggestions or promptings, persuasions or entreaties. 'It is not enough that the testator is persuaded by solicitation or argument from disposing of his or her property as he or she previously intended'; it must amount to moral coercion.'" Whitney v. Murrie, Tex.Civ.App., 264 S.W. 270.

"'Persuasion, entreaty, cajolery, importunity, argument, intercession, and solicitation are permissible, and cannot be held to be undue influence unless they subverted and overthrew the will of the testator and caused him to do a thing he did not desire to do.'" Decker v. Koenig, Tex.Civ.App., 37 S.W.2d 378, which latter case gives an interesting and informative discussion of the indentical issues involved in the case at bar.

■ Appellants produced three witnesses, the first and main witness being J. P. (Pink) Maberry, a distant relative of the testator, who lived in Fisher County about 150 miles from the home of the deceased. The witness had lived at said place about 60 or 61 years, and had known B. A. Barton during all of said period of time. Said witness testified that during the last 30 years, he would see B. A. Barton twice each year and sometimes oftener; that during the last 15 years, B. A. Barton had visited the witness at least four times, and stayed from three weeks to two months at a time; and that on such visits, B. A. Barton talked to witness freely about business and his health. In answer to objection of appellees' counsel as to remoteness of said conversations, the witness said it had been 12 or 15 years. One of said conversations related to two or three months spent by B. A. Barton at a Sanitarium at Santa Anna, during which time he disagreed with the doctors as to the nature of his ailment, said B. A. Barton insisting that "it was worms that was the matter with him". Witness visited B. A. Barton while he was in the Sanitarium, and saw him again in two, three or four months. Witness also received some letters from B. A. Barton, one of which was introduced in evidence. It was dated March 2, 1944, and expressed the desire that witness come to see him. Over objection, the witness was permitted to testify as to similar letters previously received, in which B. A. Barton would complain of feeling badly and invite the

witness to visit him. The witness acknowledged that he had some of the letters and that others had been destroyed.

In response to said letter of March 2, 1944, the witness came down. He testified that on this visit, B. A. Barton told witness that he (Barton) would go out and get lost and needed some one to help him, and that he was taking some tablets which the doctor had given him. That said conversation took place in B. A. Barton's fire place room and Frank Bailey was present. As to what was further said, we quote: "Well, he asked me—he told me and asked me—anyway, he said, 'Pink, what I wanted to get you to come down here for was I wanted to see what you think about a will; if I should make a will; I want your advice', and I said, 'Bailey, my God, me and Frank Bailey don't need to advise you to make a will, it would be torn all to thunder if we did', and then I said, 'You go to Coleman and get you a good lawyer if you do make a will, to some stranger and not to me or Frank Bailey'. Then Frank Bailey remarked, 'If that is the way you are going to fix it, you and him can have it; I will have no more to do with it' ".

The witness further said: "I said if he wants to put me in his will, that is his business, and if he does not, that is perfectly all right, and I said 'that is your right', speaking to Bailey Barton; and he said to me, 'Well I think all my kin folks ought to have their part' ".

On being questioned further, said witness admitted that said testator "should have known" the amount of land and cattle which he owned, and that he "should have known" his relatives; that he attended to his own banking business and other affairs. The witness further testified that prior to the time of forming an opinion as to the soundness or unsoundness of testator's mind, said B. A. Barton had told him that he did not like the water at Santa Anna; that it was poisoned, and that he drank creek water instead; that B. A. Barton had told him that his mind was so blank that he could remember nothing, and that when he traveled, he put some extra gasoline in his car. Many of the alleged conversations with the testator took place long prior to April 4, 1944, date of the will, and others subsequent to said date. The witness admitted on cross-examination that Lillie Hardy had been living in Oklahoma and California for 25 or 30 years; that Jim Madison Barton had lived in California for about 20 years; that Willie Barton Graham had lived in California for about 20 years; that the whereabouts of Bailey Y. Barton had been unknown to the family for 20 years; that Mary Alice Jones for years had lived in New York; the witness did not know where Christene Ranft lived; and that none of said relatives had ever cared for B. A. Barton.

The second witness called by contestants was Lee Wells, who lived in Brownwood, but formerly in Coleman County. He was 67 years of age. He testified that while he lived in Santa Anna, he did some work for B. A. Barton, such as cutting wood, hauling water and odd jobs; that he had driven B. A. Barton's car some, and that Barton would put some gasoline in the tank and some in a container in the car; that B. A. Barton did not like the Santa Anna water and was afraid he would get poisoned; that Barton would get lost in his pasture and wander around; that the last time he saw the deceased was in Brownwood a week or two before he died; that the deceased told the witness that he had not finished his will. Based upon the above testimony and over objection, Wells was permitted to give his opinion that B. A. Barton was of unsound mind. But on cross-examination, the witness acknowledged that B. A. Barton knew how much land he owned, knew his relatives and transacted his own business most of the time before his death. The witness further testified:

"Q. Do you think he had sufficient mental capacity to know how many cattle he had? A. Yes.

"Q. As a matter of fact Mr. Bailey Barton was a man of shrewd mind and had his own mind about what to do? A. He had his own mind."

The last interview the witness had with B. A. Barton was approximately a year and a half after the will had been executed. He testified to no facts occurring at about the date of the will.

The third and final witness called by the contestants was John T. Burk, who lived in Kansas, was 74 years of age and was working as a ranch hand. He testified that he had worked for B. A. Barton in 1934 through to 1936, when he went to New Mexico; that the last time he saw the deceased was in February, 1944, at B. A. Barton's ranch home; that the deceased knew him and knew Frank Bailey, who was there. The witness talked with the deceased a short while only; that B. A. Barton had his horse saddled and could not have a long conversation, but that B. A. Barton told him about some bulls fighting in the pasture, but witness said that bulls did not fight in February. The other matters, all of a trivial nature, to which he testified were entirely too remote. Based upon the circumstances, the witness was permitted to testify that he thought the deceased was of unsound mind.

As against the testimony of contestants (appellants), appellees produced a strong array of witnesses, many of whom had known the deceased well for 40, 50 and 60 years. Several of them, W. Carl Williams, one of the witnesses to the will and whose place adjoined the B. A. Barton ranch, and who had frequent contact with the deceased; Ted Stewartson, another near neighbor, who in addition to detailing intimate contacts with the deceased, testified that about a week before Barton's death, said testator came to the witness's home and they agreed on a lease of part of the Barton ranch to witness; Melvin Barrington, another near neighbor, who took an oil lease from B. A. Barton and drilled a well on the tract; Curtis Collins, former County Commissioner; Clyde Windham, a blacksmith at Santa Anna, who shod Barton's horses and did other work for him; Fred West, a neighbor, who saw Barton often and frequently had meals with him; Mrs. John West, who lived about one mile from Barton, who had Barton as a guest in her home on July 16th before he died; Rhome Milligan, who had known the deceased during the entire life of witness, and who saw and talked with the deceased often; Talley Allison, a neighbor, who had known Barton for 66 years and had frequent contacts with him; C. W. Hemphill, a banker, who testified to knowing Barton for more than 50 years; Sam Collier, of Santa Anna, a real estate and insurance man, who had business dealings with Barton practically to the time of his death; W. A. Standley, a blacksmith at Santa Anna, who did much blacksmithing for Barton; Leman Brown, County Judge of Coleman County, and for many years Barton's banker and business consultant, testified that the deceased had discussed with him the matter of making a will and had outlined substantially the same will which Judge Weatherred wrote about 10 days later; Eric Geeslin, who worked for Barton during 1944; J. P. McCord, President of First National Bank at Coleman, and who handled numerous large estates; L. Emmett Walker, former County Clerk of Coleman County for 20 years; O. L. Chaney, Barton's banker at Santa Anna; F. E. Stevens, business man at Coleman; and Judge W. Marcus Weatherred, attorney for Barton for a number of years before his death, and the attorney who wrote the will. All of said witnesses, after detailing their acquaintance with the deceased and their observations of and contacts with him, testified that in their opinion B. A. Barton was of sound mind. Several of them testified that the deceased attended to his business affairs to the time of his death, and that he had a shrewd business mind. The high standing of said witnesses lends must weight to the evidence.

Judge Weatherred testified at length, but we shall here set out only a few high lights of his testimony. He testified that on the morning of April 4, 1944, said B. A. Barton sent word to him to come to the ranch on important business; that he went, taking his typewriter; that when he arrived, Barton told him that he wanted to make a will; that he outlined what he wanted it to contain to Judge Weatherred, who made pencil memoranda and then typed it; that at first there were no other persons present, but that later, W. Carl Williams and Dennis Hays, the latter now deceased, came into the room; that when the typing was finished, at the request of Mr. Barton, he read it aloud in the hearing of said parties, with some explanations asked for by Mr. Barton, who then stated that it was just

what he wanted, whereupon, it was then signed by the testator and by said W. Carl Williams and Dennis Hays as attesting witnesses. In this testimony, Judge Weatherred is corroborated by said W. Carl Williams. Later, others came into the room and they had a social visit together. It may be noted that not one of the beneficiaries was present until after the will was executed. It is further significant that no witness on either side testified to any acts of "compulsion, duress, threats, persuasion and argument" brought to bear on B. A. Barton on said occasion or at any time in regard to the making of said will.

In addition to the testimony of several defense witnesses as to contacts and conversations with the deceased immediately prior to the date of execution of said will, and that in their opinion, the testator was of sound mind, a provision of convincing force occurs in the will itself. The testator gave to Frank Bailey, his nephew, only a life estate in the estate with unlimited control over the personal property, but without power to alienate the real property, with remainder of all property in fee simple over to the two children of Frank Bailey, to wit, Harbert Anderson Bailey and Annie Therisa Dimbleby. This was in harmony with what, only a few days before, he had told Judge Leman Brown that he desired to devise and bequeath his estate to Frank Bailey, but that he "wanted some strings to it", so that Frank Bailey could not dispose of the land. Other thoughtful provisions were the naming of Frank Bailey as independent executor without bond, and that any devisee or legatee contesting the will should forfeit his or her devise or bequest. The will indicates the purpose and design of a sound mind, and careful thought in advance to the end that his estate be not dissipated but kept intact until such time as the legatees in fee simple should be entitled to its possession and enjoyment.

We further think that the will as made was the natural will under all the attendant circumstances. The evidence showed that Frank Bailey and his family had lived with the deceased for nine and a half years. That this relationship had continued for so long a period certainly indicated harmony and congeniality. It would be natural to assume that during said time, Frank Bailey and his wife tenderly cared for B. A. Barton in his declining years, and that their two children, residuary legatees herein, having grown up in his home and with him continuously, would have endeared themselves to him in such degree as to create within him an affection for them almost filial in its intensity. That they should be made the principal beneficiaries under his will is not unnatural. See 44 Tex.Jur. 604, 611, Sec. 62 to 68, and authorities therein cited.

■ In their first counterpoint, appellees insist that the trial court should have instructed the jury to render a verdict in their favor. However, out of an abundance of caution, the careful trial judge, after considering contestants' evidence in its most favorable light and independent of proponents' evidence, reached the conclusion that there was sufficient evidence of a substantial character to raise a question as to the testator's soundness of mind. But if the trial court erred in overruling the motion for an instructed verdict in favor of proponents, it was harmless error. The jury found against contestants on both counts as to incompetency and undue influence.

■ Contestants complain of the admission of certain testimony elicited on cross-examination of the witness J. P. Maberry. The witness Maberry was asked about a transaction with Pink Barton (a brother of testator, Bailey Barton). The witness Maberry admitted that he had deposited in the bank in Sylvester, Texas, the sum of $5,000 that he had received from Pink Barton. The witness contended that Pink Barton had given him this money. It was the contention of the proponents that Pink Barton had made a loan of $5,000 to the witness Maberry. In connection with this testimony the proponents introduced the will of Pink Barton showing that Bailey Barton was the principal devisee under such will. The witness Maberry further testified that after the death of Bailey Barton that Frank Bailey had asked him to pay the $5,000 and that the witness had refused to make such payment. Contestants objected to all of the

testimony offered with reference to this transaction and to the introduction of the will of Pink Barton. We are of the opinion that the evidence was admissible as tending to show the interest of the witness Maberry in the outcome of the instant case. It was permissible for the proponents to show, if they could, that the witness Maberry was indebted to the estate of Bailey Barton, and in order to do so, it was necessary to show that Bailey Barton was the principal devisee under the will of Pink Barton.

■■■ By other points, contestants complain of the admission by the court of the testimony of several witnesses to the effect that B. A. Barton had sufficient mental capacity to know that he owned his ranch, that he knew the number of cattle that he had, that he knew his kin and their relationship to him, that he had sufficient mental capacity to look after his business and could carry on a good conversation. We see no error in the admission of this testimony. Under the law it is not admissible for a witness to testify that a testator does or does not have the capacity to make a will or that he does or does not have testamentary capacity, but a witness who has had an opportunity of knowing and observing the conversation, conduct and the manners of the testator may testify as to particular facts, and also give his opinion as to the sanity of the testator based upon actual observation. Before a witness can express an opinion on this question, he must detail facts and circumstances upon which to base an opinion as to the sanity of the testator. As we view the evidence complained of, it does not come within the rule that precludes a witness from testifying that the testator did or did not have testamentary capacity. The witnesses were shown to have been well acquainted with the deceased, Bailey Barton, and to have known him for many years. They had had an opportunity to see and observe him and talk to him on many occasions, and from this long acquaintance and observation, they were qualified to testify that in their opinion, he had sufficient mental capacity to know that he owned the Barton ranch; further, that he looked after his own business and that he had sufficient mental capacity to know the number of head of cattle he owned and to know his kin and

the relationship they bore to him. This testimony was an opinion of the witnesses on the "mental condition" of the testator and was not a conclusion on the question of his "legal capacity" to make a will. We find no error in the admission of such testimony. Hudson et al. v. Fuson et al., Tex. Civ.App., 15 S.W.2d 166; McCormick and Ray, Texas Law of Evidence, Sec. 637.

■■■ We see no error in the admission of the testimony of Judge Leman Brown, County Judge of Coleman County, wherein he was permitted to testify that Bailey Barton had talked to him several times about making a will and that Mr. Barton told him he wanted to make a will to Frank Bailey, that is, he wanted to will his property to Frank Bailey, but he wanted strings attached to it as he did not want the property sold during the life of Mr. and Mrs. Bailey. Judge Brown further testified that after Mr. Barton had executed the will, he (Judge Brown) read the will and that the will covered about what Mr. Barton told him he had wanted. Contestants objected to this testimony on the ground that it was immaterial. We are of the opinion that any statement made by the testator that tended to support the will was admissible. Shepherd v. Stearns, Tex.Civ. App., 45 S.W.2d 246.

All other points raised by appellants have had careful consideration and are overruled.

The judgment of the trial court is affirmed.

## On Motion for Rehearing.

■■■ The trial court, over the objections of contestants, permitted the witnesses Melvin Barrington, Rhome Milligan and Tallie Allison to testify that the testator, B. A. Barton, had sufficient mental capacity to know that he owned the Barton Ranch, the number of cattle he owned and to know his relatives and their kinship to him. In our original opinion, we held this evidence admissible. Upon further examination of the record, we find that similar evidence was admitted without objection by the contestants. We are of the opinion that our original holding is sound, but as an additional reason for holding that no reversible error is shown, we say that con-

testants cannot now complain of the admission of such testimony for the reason that similar testimony was admitted without any objection on their part. McCormack and Ray, Texas Laws of Evidence, p. 23; McKee v. Reed, Tex.Civ.App., 166 S.W.2d 353, 358.

■ By another point contestants complain of the action of the trial court in permitting the witness, Carl Williams, to testify that B. A. Barton had sufficient mental capacity to know his relatives and their kinship to him. Contestants made no objection to the testimony at the time it was offered, hence reversible error is not shown.

Counsel for proponents propounded the following question to the witness, F. E. Stevens: "During all the time that you knew B. A. Barton, judging from your observation of his appearance and his actions, his conversation and demeanor, in your opinion was he of sound or unsound mind?" Counsel for contestants objected to this question. The court overruled the objection. The witness was then instructed to answer the question. His answer was, "I always found his mind to be perfect in every way; he would tell me of different things on his place and I know it was that way." Contestants assign as error the admission of such testimony. It is apparent that the answer of the witness was not responsive to the question as propounded. No motion to strike the answer was made by the contestants. Under such circumstances no reversible error is shown.

■ Complaint is also made to the testimony of the witness, Maberry, who testified on cross-examination as to the mental capacity of testator, B. A. Barton, to make a will. It appears to us that the testimony of the witness was favorable to the contestants and that no error is shown.

■ Judge W. Marcus Weatherred, an attorney who drew the will in question, testified as follows: "I notice this, gentlemen, in the writing of the will. I noticed in reading this instrument that I omitted after the word 'nieces' the word 'children'." Contestants complain of this testimony and say that it was an effort on the part of Judge Weatherred to construe the will.

We do not agree with this contention and this point is overruled. 44 Tex.Jur., p. 730. We believe that we made a correct disposition of this case in our original opinion and the motion for rehearing is overruled.